# *Ex Parte* Bozeman.

## *Violating Motor Vehicle Law.*

(Decided June 30, 1913.   63 South. 201.)

1. *Constitutional Law; Presumption; Statutes.*—Where it is reasonably doubtful whether a statute is constitutional the doubt should always be resolved in favor of its constitutionality.

2. *Same; Construction.*—Constitutions are adopted for practical purposes and are entitled to practical and reasonable interpretations, and if, when thus interpreted, a statute meets the constitutional provisions, its constitutionality should be upheld.

3. *Same; Extrinsic Aid In.*—Where the language of the statute is clear and unambiguous, and there is no room for construction, the courts cannot attempt to arrive at the intention of the lawmakers by considering extrinsic matters, such as debates of the legislature or the debates of the Constitutional Convention.

4. *Licenses; Motor Vehicles; Constitutionality.*—Section 221, Constitution 1901, is intended to prevent discrimination against counties and municipalities by the levy of one tax for the sole benefit of the state to the exclusion of the counties and the municipalities, and such constitutional section is not violated by Acts 1911, p. 636, since the act expressly provides for the apportionment of the revenue thus raised between the state and the county, or incorporated town or city upon a basis of forty and sixty per cent.

(McClellan and Mayfield, JJ., dissent.)

CERTIORARI to Court of Appeals.

Robert H. Bozeman was convicted of violating the Motor Vehicle Law, and appealed to the Court of Appeals, where the judgment of conviction was affirmed,

and he seeks to review such judgment by certiorari. Writ denied.

ARRINGTON & HOUGHTON, for appellant. The act under consideration is violative of section 221, Constitution 1901.—*City of B'ham. v. So. Ex. Co.*, 164 Ala. 533; *Little v. Foster*, 130 Ala. 163; *Ex parte Mayor, etc.*, 78 Ala. 23; *Lehman v. Robinson*, 59 Ala. 241; *State ex rel. Covington v. Thompson*, 129 Ala. 106; *State ex rel. Robinson v. McGough*, 118 Ala. 166; 8 Cyc. 840. Appellant further contends that the license fee is in exercise of the police power, and that its amount is unreasonable and void; if an exercise of the police power it cannot become a revenue measure; if a revenue measure, it is void because passed during the last five days.—*Casey v. Brice*, 55 South. 810; *Commissioners v. Boyd*, 188 Mass. 79; *State v. Parker*, 59 South. 741; *Van Hook v. City of Selma*, 70 Ala. 361; *Smith v. Com. Ct.*, 117 Ala. 196. The act violates section 2, article 4 of the Federal Constitution.

R. C. BRICKELL, Attorney General, and T. H. SEAY, Assistant Attorney General, for the State. The act in question is constitutionally valid, and should be upheld as such.—*Gentry v. City of Mobile*, 54 South. 488; *City of B'ham. v. So. Ex. Co.*, 164 Ala. 529; *Kemmemar. v. State*, 150 Ala. 74. Where a statute is clear and unambiguous, it needs no construction, and the court will not consider such extrinsic matters as legislative debates for the purpose of arriving at the intention of the act.—*Little v. Foster*, 130 Ala. 163. This defendant is not in position to raise the constitutionality of the act in the method here contended for.—*State ex rel. Thomas v. Gunter*, 170 Ala. 165; 49 N. E. 582; 47 N. W. 44; 8 Cyc. 791. The act is not a revenue statute but a license

statute.—*Dunbar v. Fraser*, 78 Ala. 538; *Shepherd v. Dowling*, 127 Ala. 1.

DE GRAFFENRIED, J.—This case involves the constitutionality of section 7 of what is known as the "Motor Vehicle Law" and which is as follows: "The following license tax or registration fee shall be charged on motor vehicles used for private use: Seven and one-half dollars upon each motor vehicle having a rating of less than twenty horse power; $12.50 upon each motor vehicle having a rating of twenty horse power and less than thirty horse power; $17.50 for more than thirty and less than forty horse power; $20.00 upon each motor vehicle having a rating of forty horse powed, or more; and such fee shall be based on the insurable horse power of the car. Twelve dollars and a half on each electric motor vehicle, and fifteen dollars on each motor vehicle propelled by steam. Three dollars on each motorcycle. The following license tax or registration fee shall be charged on motor vehicles used for hire: Upon each motor vehicle used for public hire in transporting passengers or freight $25.00. Each manufacturer or dealer in motor vehicles shall pay a license tax of $100.00. Each person, firm or corporation conducting a garage, or garages, shall pay a license tax of one hundred dollars, for each garage. Said several sums of money charged as a license tax herein shall be paid to the Secretary of State and forty per centum of the gross revenue derived from any incorporated city or town shall revert to the treasurer of the city or town in which the owner or licensee resides, and forty per cent. of the gross revenue derived from any county outside of any incorporated city or town shall likewise revert to the treasurer of said county. The registration fee or license tax shall be in lieu of all other privilege li-

censes which the state, or any county or municipality thereof might impose, but nothing in this section shall be construed to prevent the collection of any ad valorem tax."—Laws 1911, p. 636.

It is contended that said section violates section 221 of the Constitution and is therefore void. Section 221 of the Constitution is as follows: "The Legislature shall not enact any law which will permit any person, firm, corporation, or association to pay a privilege, license, or other tax to the state of Alabama, and relieve him or it from the payment of all other privilege and license taxes in the state."

It is contended that said section of the "Motor Vehicle Law" is void because it *permits* the appellant, Bozeman, to pay a license tax to the state of Alabama for the privilege of running his "motor vehicle" and *prohibits* cities, towns, and counties in the state from requiring a license tax from him for the privilege of running his "motor vehicle" in such cities, towns, or counties. In other words, says the appellant, the above section 7 of the "Motor Vehicle Law" permits persons, firms, corporations, and associations to pay a privilege or license tax to the state of Alabama and relieves them from the payment of any other privilege and license taxes in the state. It is therefore, according to the appellant's contention, violative of the above-quoted section 221 of the Constitution.

1. It is one of the cardinal rules governing the construction of statutes that, when the question as to whether a particular statute is or is not constitutional is *reasonably* in doubt, then the doubt should be resolved in favor of the constitutionality of the act.—*Lovejoy v. City of Montgomery,* 9 Ala. App. 466, 61 South. 597, present term; *State ex rel. City of Mobile v. Board, etc., Commissioners,* 180 Ala. 489, 61 South. 368.

The reason for the above rule is that the Legislature which passed the act is presumed to have sat in judg-ment, while the act was before it, upon the question as to whether the Legislature possessed the constitutional power to make such a law. That body having passed the act, the law presumes that the judgment of the Leg-islature was that the act was constitutional. This judg-ment of the Legislature, while not conclusive upon the courts, is entitled to, and under the above rule must re-ceive, great weight at the hands of the courts. It is a solemn thing for a court to strike down a statute, and when it does so its reason therefor should be clear and strong and should lead to the irresistible conclusion that the act is invalid. The people of Alabama, when they adopted the present Constitution, gave forcible evi-dence of their recognition of and their acquiescence in this legal truism. Local legislation had, before the adoption of the present Constitution, been a menace to the security of healthful general laws; and, to empha-size their distaste to legislation of that character, the people expressly declared in section 105 of the Consti-tution that "no special, private or local law, *except* a law fixing the time of holding courts, shall be enacted in any case which is provided for by general law, or when the relief sought can be given by any court of this state; *and the courts,* and *not the Legislature,* shall *judge* as to whether the matter of said law is *provided for by a general law,* and as to *whether* the relief sought can be given by any court," etc. The italics in the quoted sec-tion 105 of the Constitution were placed there by the writer for the purpose of showing how emphatically the people, when they adopted the present Constitution, recognized the rule of construction to which we have above referred.

2. The purpose of the people when they adopted the above-quoted section 221 of the Constitution is, when read in the light of the legislative history of the state, plain and unmistakable. The Legislature had not been unaccustomed to pass acts which required of those who desired to carry on a particular character of business in the state for which a license tax might be lawfully required to pay a license tax for the state *only* and in which the state only participated. Cities and towns were thus frequently left without power to derive *any revenue* in the shape of license taxes from those to whom they were constantly furnishing municipal protection. It was this inequality which said section 221 of the Constitution was intended to prevent, and it seems that the act under consideration in no way defeats or comes in conflict with the purposes of said section. The act, it is true, levies only one privilege tax, but it equitably divides the tax so levied between the state and its towns, cities, and counties and thus carries into effect the true purpose of said section 221. If the tax was so distributed among the cities, towns, and counties as to *clearly indicate the legislative purpose to defeat* the *will* of the people as expressed by them in said section, then an entirely different question would be before us. Courts have with persistent frequency called attention to the fact that Constitutions are adopted for practical purposes and are entitled to reasonable and practical interpretations; and, when a statute meets the provisions of a Constitution which is thus interpreted, its constitutionality should always be upheld.—*Lovejoy v. City of Montgomery, supra.*

We are not inclined to adopt the view that the act in question appears, on account of the manner in which the license fund is distributed, to be in conflict with the above constitutional provision. On the contrary, as

already stated, it shows, on its face, an equitable distribution of the license tax between the state and its various political subdivisions, and carries, therefore, on its face a legislative effort to meet the requirements of said constitutional provision.

There is on file in this case, which will be published as a dissenting opinion, an opinion prepared by Mr. Justice MAYFIELD. If the Legislature in this act had, to quote the language of Mr. Justice MAYFIELD, given the "lion's share or the house's share" to the state or to its towns and cities and counties, then the act might be subject to criticism and its constitutionality might be called into serious consideration; but the apportionment of the license tax imposed by the act is equitable and just and for that reason the act is not subject to this criticism. In this connection it may be of service to call specific attention to section 2086 of the Code of 1907. *There* the Legislature fixed the privilege tax to be paid to the *state* at $4,000, and in the same *identical* act *fixed* the *exact* amount which might be levied upon express companies, by cities and towns, for the privilege of doing business in such cities and towns. The amount of the tax which *each* city and town might levy for the stated purpose was fixed with as much definitenes as if. *each city* and *town* in the state had been *named* in the *act* and the amount which *each* town could *so levy* had been definitely fixed at a named sum in the act. The act was, however, held by this court to be a valid exercise of legislative power.—*City of Birmingham v. Southern Express Co.*, 164 Ala. 529, 51 South. 159.

The reasoning of this court in the opinion which was handed down in the above case (and the opinion was unanimously concurred in by all of the *then* members of this court), it seems to us completely answers all ar-

guments which can be advanced against the constitutionality of the act now under consideration. The only material difference between the section of the Code which was held to be constitutional in *City of Birmingham v. Southern Express Company, supra,* and the act now under consideration is, in so far as the question under discussion is concerned, simply one of machinery. Both acts effect the same purpose, and, while there is *less machinery* provided for in the act now under consideration than was required by said section 2086 of the Code, the true legal effect, in so far as the question we now have in hand is concerned, of the act under consideration and said section 2086 of the Code is the *same.* In the above case the court said, "The Legislature has not seen fit to delegate the power to fix the amount of this license or privilege tax;' and it upheld the said section of the Code as violative of no provision of the Constitution. In the act under consideration "the Legislature has not seen fit to delegate the power to fix the amount of this license tax," and we can see no reason why this act is not also, upon the identical reasoning of this court in said case of *City of Birmingham v. Southern Express Company, supra,* a valid exercise of legislative authority. In the instant case the method of enforcing the municipal tax is more direct than is the method provided in said section 2086 of the Code, but we can see no reason why a legislature may not *directly* do anything which it may *by an indirection* do.

The above case of *City of Birmingham v. Southern Express Company, supra,* was referred to by the Court of Appeals in its able and exhaustive opinion on file in this case, and it seems to us that the conclusions which the Court of Appeals reached in that opinion are not only well based but that in its opinion that court has given a clear and unanswerable exposition of the law of this case.

3. We quote with approval the following from the language of the Court of Appeals in its opinion in this case: "When the language as used by the lawmakers is plain, it is the duty of the courts to obey; no discretion is left; and courts should not stray into bypaths or search for reasons outside of the plain letter of the law upon which to rely for the purpose of giving a different meaning or interpretation, for 'when the language is plain it should be considered to mean exactly what it says.'—*Little v. Foster*, 130 Ala. 163 [30 South. 477]. * * * When the meaning of a constitutional provision is plainly expressed by its words, there can be no occasion or excuse for a resort to extrinsic sources of information as to its import. As in such case the court would not be justified in according to the provision any meaning other than that which its words express, it would be wholly inappropriate for the debates of the constitutional convention on the occasion of its adoption of the provision in question, or substitutes or amendments then proposed or rejected, to be looked to to find another meaning to impute to the language used."—*Robert H. Bozeman v. State of Alabama*, 7 Ala. App. 151, 61 South. 604, present term, and authorities there cited.

Mr. Justice MAYFIELD, in his able dissenting opinion in this case, has referred to the debates of the constitutional convention, when the section now under consideration was before that body, but the debates of that convention upon the particular subject are, in fact, strong evidence of the wisdom of the above-quoted language of the Court of Appeals. During the debate on that subject, when section 221 was first offered to the convention, the chairman of the committee from which it emanated said: "I desire to say for the information of the convention with reference to this section that it

is designed to meet a situation which exists in Alabama to-day. I will illustrate this by saying that the Southern Express Company has procured the passage by the Legislature of a law authorizing it to do business in this state upon the payment of a certain license to the state, and it has been held by the Supreme Court, in a case originating in the city of Anniston, that this license paid to the state was in lieu of all other licenses which could be charged to the express company for doing business in Alabama. As the gentleman in the convention know, in the cities in this state, every person, firm, or corporation that is engaged in business in the city limits pays into the city treasury a certain privilege or license tax for doing business in that city. The railroads, the street railroads, the telegraph companies, the telephone companies, and all other corporations and individuals pay this license, but there is not a town or city in Alabama that has been able to collect a license from the Southern Express Company on account of this decision. I submit, gentlemen, that it is not right or proper to allow the Legislature to barter and traffic with corporations at the expense of the municipalities in this state; and, if it is right and proper that all corporations should pay this license, it is right that this particular corporation should pay it. This explains the section as introduced."

The section was discussed at some length by members of the convention, and we herewith quote the conclusion of the discussion: "Mr. Weatherly: 'Mr. President, I favor the idea of allowing a municipality to impose a license tax upon any corporation that does business within its limits. I think that it is right, and I think that power should be amply preserved to the municipalities of the state, but I desire to call the attention of the convention to a contingency which might

arise in the future somewhat like the contingency or
situation that has arisen with reference to the taxation
of railroad corporations. Wherever a railroad or other
like corporation does business through a continuous part
of the territory of a state, running through one county
after another, or one city after another, if the county
or municipality is alive to its own independence and
free action in the levying of taxes, it gives rise to in-
equalities and injustice; hence it has been found nec-
essary in the state of Alabama, and in a great many
other states, in fact, I believe in nearly all the states
of the Union, if not all, in the matter of taxation of
railroad property to put the power of taxation in the
hands of a state board.' Mr. Graham (Montgomery):
'Isn't it a fact that railroad companies in Alabama pay
these taxes in every town and city through which they
pass?' Mr. Weatherly: 'Certainly they do; I freely
admit that; and I say the other corporations ought to
do it, too. I am not making that point, but I am mak-
ing the point that you ought not to withdraw it from
the power of the state of Alabama, in case need should
be, to take upon itself the right of levying all these
taxes uniformly and distributing pro rata the license
taxes to the municipalities. That is the proposition.
I do not think that the state of Alabama should collect
a municipal tax (a privilege tax) and put it in the
treasury and deny it to the municipality, but the time
may come when the state of Alabama may want to say
to its people, "I take back to myself the power of levy-
ing these taxes." "I will levy a privilege tax for the
city of Montgomery of so much upon a certain corpor-
ation and for the city of Mobile of so much," and then
the state of Alabama, will distribute it to the cities
equitably. This section prohibits the state of Alabama
from doing anything of that sort.' Mr. Boone: 'I will

ask you if the purpose of this section is not to prevent the state from taking to itself all these licenses, and what you urge is not applicable to this section because the state could levy the tax and distribute it under this still to the cities and towns?' Mr. Weatherly: 'I haven't so read it. It says that "the General Assembly shall not enact laws which will permit a person, firm, corporation or association, of any character, to pay a privilege license or other tax to the state of Alabama, and relieve him or it from the payment of all other privilege and license taxes in the state." As I read that, it prohibits the payment of any privilege, license or license taxes to the state, and thereby relieving them of paying it to the city or municipality.' Mr. Boone: 'Isn't the object of that section to prohibit them from taking those licenses away from the city?' Mr. Weatherly: 'Certainly, but I say that it goes further than that.' Mr. Boone: 'Does it prevent the state levying a license tax and distributing it under an equalization scheme?' Mr. Weatherly: 'I think it does. I think it would prevent the Legislature from passing a uniform law of that character. That is the very thing that section prohibits, and it is too broad. I will vote for a section which will simply impose the duty upon these municipalities of paying privilege taxes and so regulating that it will be done equitably, but I am opposed to the section as it stands. It is too broad, because it prohibits the state, in case public policy should require that it should take into its hands the duty of regulating these things, from doing it, and we ought not to pass the section in the language in which it is framed.' Mr. Beddow: 'I call for the previous question on the section.' The main question was ordered."

The plain purpose of said section 221 is thus shown by the remarks of the chairman which we have above

quoted and which purpose was, we think, as we have above stated it to be. The quoted portions of the debate between Messrs. Weatherly, Graham, and Boone show that, when the section was before the convention an *opponent* of the section placed upon the measure the construction which appellant now seeks to have placed upon it, while a *friend* of the section placed the same construction upon it which the Court of Appeals, without regard to the debates, as under the rules of law it should have done, has placed upon it. In fact, a candid statement with reference to the debates leads us to say that they are at best confusing and give but little information which can be of any value whatever to a court in passing upon the question before us.

It seems to us that in this case the Court of Appeals reached the proper conclusion and that, in all things, its opinion in this case correctly states the law.

The write of certiorari is denied.

DOWDELL, C. J., and ANDERSON, SAYRE, and SOMERVILLE, JJ., concur. MCCLELLAN and MAYFIELD, JJ., dissent.

MAYFIELD, J.—I cannot concur in the opinion or in the decision in this case. Both, in my judgment, are certainly and fundamentally wrong. The constitutional provision in question, as may be seen from the majority opinion, in which it is set out, in terms says that "the Legislature shall not enact any law which will permit any person, firm, corporation, or association to pay a privilege, license, or other tax to the state of Alabama, and relieve him or it from the payment of all other privilege and license taxes in the state." The statute in question clearly and indubitably attempts to do exactly what the constitutional provision says shall not be done. It levies *one tax,* makes it payable *to the state,*

and *relieves every person, firm, corporation, or associa-tion* that pays it "from the payment of all other priv-ilege and license taxes *in the state.*"

The language of the statute is as follows: "(The reg-istration fees imposed by this act upon motor vehicles) *shall be in lieu of all other privilege licenses which the state, or any county or municipality thereof might im-pose,"* etc. How it is possible to hold that this statute is not contrary to and in conflict with both the spirit and the letter of the Constitution, I confess I cannot understand. The language, the object, and the purpose of both the constitutional provision and the statute are plain and unmistakable. The latter attempts to do ex-actly (nothing more nor less than) what the former at-tempts to prevent. There can be no doubt that they both refer to the same thing; one prohibits the thing, and the other authorizes it; and yet the majority opin-ion and decision in this case, by a process of reasoning which I cannot understand, upholds both the statute and the constitutional provision.

The error, in my judgment, into which both the Court of Appeals and this court have fallen came from read-ing into the constitutional provision an exception (a proviso) which is not in the Constitution. In other words, the statute is upheld solely upon the theory and ground that a part of the proceeds of this unlawful levy and collection, after it is so unlawfully levied and col-lected, reverts to the municipalities, cities, towns, or counties, which are thus deprived of their taxing power over the subjects in question. It is not only conceded, but it is decided in this case, that the purpose of this constitutional provision was to prevent the Legislature from depriving the various municipalities, counties, cities, and towns of the power to levy, and to collect after being levied, those license and privilege taxes

[Ex Parte Bozeman.]

which they were otherwise expressly or impliedly authorized by the Constitution to levy and collect; and this provision of the Constitution was certainly declaratory and in recognition of the constitutional right of these municipalities to so levy and to so collect such taxes. If the municipalities had no such constitutional right or power to so levy and collect such taxes, and the provision did not confer such right, then the provision in question would be wholly nugatory. That such municipalities have always had such right and power, unless taken away by a statute like the one in question, is both conceded and decided in the majority decision and opinion, as likewise is the proposition that the certain purpose and object of the constitutional provision in question was to prevent the Legislature from doing in the future what it had been prone to do in the past— to take away from these municipalities this particular right and power to levy and collect privilege and license taxes like the tax in question.

For fear that I may misinterpret the opinion, I will here quote what my Brother DE GRAFFENRIED in an able opinion says was the object and purpose of the constitutional provision. He states: "The purpose of the people when they adopted the above-quoted section 221 of the Constitution is, when read in the light of the legislative history of the state, plain and unmistakable. The Legislature had not been unaccustomed to pass acts which required of those who desired to carry on a particular character of business in the state for which a license tax might be lawfully required to pay a license tax for the state only, and in which the state only participated. Cities and towns were thus frequently left without power to derive any revenue in the shape of license taxes from those to whom they were constantly furnishing municipal protection. It was this inequal-

ity which said section 221 of the Constitution was intended to prevent, and it seems that the act under consideration in no way defeats or comes in conflict with the purposes of said section. The act, it is true, levies only one privilege tax, but it equitably divides the tax so levied between the state and its towns, cities, and counties and thus carries into effect the true purpose of said section 221. If the tax was so distributed among the cities, towns, and counties as to *clearly indicate* the *legislative purpose* to *defeat* the *will* of the people as expressed by them in said section, then an entirely different question would be before us. Courts have with persistent frequency called attention to the fact that Constitutions are adopted for practical purposes and are entitled to reasonable and practical interpretations; and, when a statute meets the provisions of a constitution which is thus interpreted, its constitutionality should always be upheld." Herein lies the error into which by Brothers and the Court of Appeals have fallen. We are not dealing with the propriety or with the equity or with the policy of this statute, touching the disposition or division it makes of the taxes which it levies and collects for the state; but we are dealing with the question of the authority and right of the Legislature to enact this statute which, in terms, levies upon citizens a tax which is expressly prohibited and deprives the counties and the cities of the right and power to levy and collect a like tax, which admittedly they had before the passage of the statute in question, and of which right and power the Constitution said the Legislature should never thereafter deprive them.

The right and power to levy a given tax, or the right and power to deprive counties and cities of their constitutional authority to levy and collect their own taxes, cannot be determined by the disposition which is

made of the tax after it is collected.  This is the self-same argument that was advanced by the British Parliament when they levied the stamp tax upon the American Colonies.  Parliament said to the Colonies, "You ought to be satisfied, because after we levy and collect the tax we pay the greater part of it back to you."  But the Colonies, through Benjamin Franklin, replied, "We deny your right to levy or collect the tax, even though you should pay it all back to us."  Is it possible, under our form of constitutional government, that a statute which provides for a tax which is expressly prohibited by the Constitution can be justified upon the ground that the taxes so collected are equitably disbursed?  The court, I think, concedes that, if the taxes so collected by the state were not equitably disbursed (that is, were not ratably divided between the state and the counties and municipalities), "an entirely different question would be before us."  If I thought the statute could be upheld on the ground of an equitable disposition of the funds, I am not prepared to admit that the disposition is equitable.  The upkeep of the public roads is placed chiefly upon the counties.  Automobile and other motor vehicles chiefly use and wear out public roads.  Under this statute the counties, for all practical purposes, are deprived of one of their chief sources of revenue.  Why should not those who most use the public roads, and who most need good roads, pay most to keep them up?  Under the present statute the counties will not get one dollar out of every hundred collected.  I am not prepared to say that this is equitable.

If the constitutional provision were of doubtful meaning, then I would agree that that construction should be adopted, if reasonable, which would uphold the statute rather than the one which would strike it down.  But when, as in this case, both the letter and

the spirit are clear in meaning, and the statute attempts to do exactly what the Constitution plainly says shall not be done, I must stand by the Constitution and let the statute go down. I feel no hesitancy in striking down any statute which, in my judgment, is plainly and unmistakably in violation of a constitutional provision; and this I conceive the present statute to be. Such an act or statute, if such it may be called, is not law; it is legislative spoliation and destruction of the Constitution. I cannot consent to the doctrine that the law is whatever the populace at the moment may determine to be in accord with their sense of expediency or right or whatever a legislative majority may see fit to enact. Law is something more than, not merely the equivalent of, written enactments or judicial decisions. It is true that our law is to be found or sought in our written Constitutions, statutes, judicial decisions, and commentaries; yet it is not to be found in these alone, nor, perhaps, as Judge Dillon says, is it to be chiefly found there. Its sources are almost innumerable and of course are unknowable to the masses of the people, being but imperfectly known to the wisest of lawyers and judges; yet the system is such that, except in rare cases, any man with a pure heart, and imbued with a sense of justice, finds his own conduct to be in conformity with the laws of our country, thousands though they be. This is certainly strong proof of the ethical nature and the moral basis of our laws.

As is well known, and as has been so often repeated by this and other American courts, the fundamental, basic difference between our civil laws and those of other countries is that we have a written Constitution, which is the paramount law—the ark of the covenant of our fathers—and courts are constituted the guardi-

ans of this ark. This fundamental difference between our laws and those of England was well put, if not best put, by Gladstone when he said, "As the British Constitution is the most subtle organism which has proceeded from progressive history, so the American Constitution is the most wonderful work ever struck off at a given time by the brain and purpose of man." The British Constitution is changeable at the will of Parliament. As a civil lawmaking power, the British Parliament is omnipotent, and its omnipotence is responsible only to itself. With us the Constitution is unchangeable except by the people who made it; and until it is changed it is as binding upon the Legislature as it is upon the judicial and the executive departments and upon the citizen. Statutes, therefore, may not change or conflict with its provisions and hope to receive the sanction of law by the courts or by the people. Such statutes are not law.

If the statute in question is valid, then of course the Legislature can prevent all cities, towns, and counties from levying any privilege or license tax for any purpose and can give these various municipalities whatever the Legislature and this court may deem proper and equitable to compensate them from thus taking away their taxing power in this respect. I concede that this could be done but for the Constitution; but if the Constitution does not prevent what the Legislature has attempted, as to taxing motor vehicles, then of course it does not prevent the Legislature from depriving the various municipalities of all power and right to levy or collect any license or privilege taxes; and the Legislature will doubtless proceed to strip these bodies of such power and right, for it would be a great source of revenue if 60 per cent. of all the license and privilege taxes paid in the state should be paid *to the state.* If this

constitutional provision in question does not prevent the Legislature from levying and collecting one license or privilege tax for the state, in lieu of all others by the various municipalities, then the state can certainly levy and collect one ad valorem tax in lieu of all other ad valorem taxes now levied and collected by the various towns, cities, and counties. It is true that the Constitution prohibits the Legislature from levying an ad valorem tax of more than 65 cents on each hundred dollars worth of property; but the Constitution authorizes each county to levy and collect a tax of 50 cents on each hundred dollars worth of property, and also authorizes each town or city to levy and collect a tax of 50 cents on each hundred dollars worth of property; and hence the Legislature may make one levy and one collection, for the entire state, of $1.65 on every hundred dollars worth of property and then prorate the funds equitably among the cities, towns, and counties (that is, allow all the cities, towns, and counties 40 per cent. of the whole and assign to and retain for the state 60 per cent.). I submit that such a statute would not be as clearly and as certainly unconstitutional as the one upheld in this case. Such a one I suppose is only impliedly prohibited by the Constitution while the one at bar is expressly prohibited.

The question the court has for decision in this case is not the propriety, policy, or equality of a state tax law which deprives the cities, towns, and counties of the right to levy similar taxes; but it is legislative power and competency to pass such a statute when the Constitution says it shall not be done. If the Constitution had said that these municipalities should not be deprived of this kind of revenue, then there would be for decision the question whether the given statute did so deprive them of their revenue. But the Constitution

in effect, though not in terms, says that they shall not
be deprived of the right, privilege, or power of levying
and collecting this tax for themselves in such amount
(within the maximum) and for such purpose as they
each may deem proper; and it says almost, if not quite,
in terms, that the Legislature shall not levy one tax for
the state and thereby relieve the taxpayer from lia-
bility, as to similar taxes, to the towns, cities, and
counties.

I am utterly unable to understand how or why this
statute does not, in effect if not in terms, do exactly
what the Constitution says shall not be done. If the
statute in question does not do what is prohibited by
the Constitution, I am at a loss to know how one could
be drafted that would violate this particular provision
of the Constitution. The majority of the court say it
does not violate the Constitution because it distributes
the tax after it is thus levied and collected. How this
disbursement of the tax, after it is collected, can affect
the legislative power or competency to levy the tax and
to take away the power of the towns, cities, and coun-
ties to levy a like tax, I cannot understand.

I agree with Rufus Choate and Judge Dillon that the
greatest achievement in American statesmanship is that
which clothed American courts with the power, and
charged them with the duty, to declare an act of the
Legislature void when it is contrary to the Constitu-
tion and to ascertain the repugnancy and to pronounce
the legal conclusion. It was said by Mr. Choate and
quoted and approved by Mr. Dillon: " 'That the fram-
ers of the Constitution intended this to be so is certain;
but to have asserted it against Congress and the exe-
cutive, to have vindicated it by that easy yet adaman-
tine demonstration, than which the reasonings of mathe-
matics show nothing surer, to have inscribed this vast

truth of conservatism upon the public mind, so that no demagogue, not in the last stage of intoxication, denies it, this is an achievement of statesmanship of which a thousand years may not exhaust or· reveal all the good.' Other nations have what they call Constitutions or fundamental laws. England, for example. But no provision is beyond the transcendent and omnipotent power of Parliament. And therefore De Tocqueville denied that England had in reality a Constitution. His striking passage on this subject is: "The Parliament has an acknowledged right to modify the Constitution; as therefore the Constitution may undergo perpetual changes, *it does not in reality exist;* the Parliament is at once a legislative and a constituent assembly.' In the American conception of the office and effect of a Constitution, De Tocqueville's criticism is just. Belgium and France have written Constitutions, but, since they have no legal sanction, they are mere glittering declarations of abstract principles of political morality of action, having no force except such as public opinion may give them. They are not laws, since their restrictions and directions will not be enforced by the courts. We are told on unquestioned authority (Dicey, Constitution, p. 144) that 'during a period of more than 50 years no Belgian judge ever pronounced a parliamentary enactment unconstitutional,' and that 'no French tribunal would hold itself at liberty to disregard an enactment, however unconstitutional, passed by the National Assembly, inserted in the Bulletin des Lois, and supported by the force of the government.' Foreign statesmen and lawyers, after observing the workings of our Constitution in this regard for more than a century, at length join in praising the wisdom of the American device. Thus Dicey in his Oxford Lectures (1886), on the Law of the Constitution, says:

"This system [the American system], which makes the judges the guardians of the Constitution, provides the only adequate safeguard which has hitherto been invented against unconstitutional legislation.'—Lect. 3, p. 125. 'The glory of the founders of the United States is to have devised or adopted arrangements under which the Constitution became in reality, as well as in name, the supreme law of the land.'—Lest. 4, p. 145."

That the Constitution makers intended to prohibit just such legislation as is attempted in this case I think is clearly shown by the record of the debates and proceedings of the constitutional convention. In discussing the wisdom and propriety of the section, one member of the convention said: "You ought not to withdraw it from the power of the state of Alabama, in case need should be, to take upon itself the right of levying all these taxes uniformly and distributing pro rata the license taxes to the municipalities. That is the proposition. I do not think that the state of Alabama should collect a municipal tax (a privilege tax) and put it in the treasury and deny it to the municipality, but the time may come when the state of Alabama may want to say to its people, "I take back to myself the power of levying these taxes.' 'I will levy a privilege tax for the city of Montgomery of so much upon a certain corporation and for the city of Mobile of so much; and then the state of Alabama will distribute it to the cities equitably. This section prohibits the state of Alabama from doing anything of that sort."

A substitute for this section was proposed by another member to the convention, which read as follows: "If the Legislature enacts any laws which will permit a person, firm, corporation or association of any character to pay a privilege license, or other tax to the state of Alabama and relieve him or it from the payment of

all other privilege and license taxes in this state, it shall provide for a just proportion of such tax to be distributed among the several municipalities in which such person, firm, corporation or association does business." The substitute was rejected by a vote of 60 to 13.

Another member said in the convention, relative to the amendment: 'Is it not a fact from your reading of the substitute proposed to be offered by the gentleman from Clarke that it is left entirely with the Legislature as to what proportion they should allow to the cities and they might make it one-tenth or so that the cities would get a dollar apiece?"

So the convention certainly went on record as being opposed to allowing the Legislature to do exactly what it attempted to do in this act. We find no constitutional provision, similar to the one in question, in any of the Constitutions of the other states. The provision in question first appeared in our Constitution of 1901.

It is, however, a matter of common, and therefore judicial, knowledge that prior to our Constitution of 1901 most of the charters of municipal corporations were granted by separate local statutes as to each municipality, and that these charters, or many of them, were amended at every session of the Legislature, and that as a rule they authorized the municipality to levy and collect license and privilege taxes. There was also passed at every session an act known as the general revenue bill, and it always contained a schedule of license and privilege taxes levied and collectible for the state. There were also passed at nearly every session of the Legislature other general statutes levying a special privilege or license tax upon various public service corporations doing business in the state, such as telegraph, telephone, express, and Pullman palace car companies; and many of the municipalities, by virtue of their char-

ters, also levied and collected similar license and privilege taxes from such companies. In order to prevent the municipalities from thus levying and collecting such taxes, the custom grew up of making these taxes very large in the general bills and making them in lieu of all other taxes of that nature, thus repealing those provisions of the municipal charters which allowed the levy and collection of such taxes. Then, at the next session of the Legislature, many of these municipalities would have their charters re-enacted or amended so as to except them from the provisions of the general statute. And then the Legislature would wittingly or unwittingly re-enact or amend the general law so as to again repeal the provisions of the charters of the municipalities which had been thus re-enacted or amended. And thus this game of battledore and shuttlecock went on between the municipalities on the one side and the public service corporations on the other.

It was the evident purpose of the constitutional convention to put an end to this kind of legislation, and section 221 of the Constitution forms the prohibition or barrier which it erected against such practice.

The above is a part of the legislative and judicial history of this state. The peculiar conditions touched upon have been before mentioned and referred to, in the opinions of this court, in the cases of *Birmingham v. Southern Express Company,* 164 Ala. 533, 51 South. 159; *Douglass v. Anniston,* 104 Ala. 291, 16 South. 133; *Southern Express Company v. Tuscaloosa,* 132 Ala. 326, 31 South. 460; *Holt v. Birmingham,* 111 Ala. 369, 19 South. 735; *Hewlett v. Camp,* 115 Ala. 499, 22 South. 137.

Some of the above cases also dealt with another constitutional provision, not involved in this case, which was as follows: "The General Assembly shall not have

power to authorize any municipal corporation to pass any laws inconsistent with the general laws of this state."

It is very true that a municipal corporation cannot exercise any powers except such as it is authorized to exercise by the Legislature; but it is likewise true that the Legislature cannot exercise a power in a manner or by means expressly prohibited by the Constitution. These license and privilege taxes, whether levied for the state or for a municipality, cannot lawfully be levied or collected in a mode or manner, or by a species of legislation, which is expressly or by necessary implication prohibited by the Constitution.

For these reasons I am of the opinion that the particular sections of the act above referred to, to wit, sections 7, 9, and 32, are in violation of section 221 of the Constitution and are therefore void.