This is an appeal from an order of the Circuit Court of Montgomery County enjoining the Comptroller, acting Finance Director and Treasurer of the State of Alabama from making payments from public funds under the authority of Act No. 343 of the Regular Session of the Legislature, 1975. We affirm.
That Act follows:
 Section 1. All former Governors of the State of Alabama upon reaching the age of sixty (60) shall be entitled to a monthly retirement payment out of the General Fund in the State Treasury which shall equal 68% of the Governor's salary if said former Governor had served *Page 762 
for one full term or less; the amount paid shall equal 100% of the Governor's salary if he has served two full terms or more.
 Section 2. All former Governors of the State of Alabama, regardless of age, who sustain permanent total physical or mental disability during his term of office, by accident or otherwise, shall be entitled to his full salary for life upon leaving office.
 Section 3. Said payments to be paid out of the General Fund in the State Treasury on a monthly basis each and every month once a former Governor becomes eligible for such payments. A former Governor eligible for compensation under Section 2 shall not receive payment under Section 1 hereof.
 Section 4. Disability under Section 2 of this Act shall be determined as of the date the person so entitled leaves the Governor's office by resignation or otherwise. Proof shall be made by any interested party to the State Finance Director, who shall promptly certify the fact of disability to the State Comptroller. It shall be considered sufficient proof if three (3) practicing physicians certify under oath that a former Governor is so permanently totally disabled.
 Section 5. All laws or parts of laws in conflict with the provisions of this Act, and specifically Act No. 304, H. 345, 1967 Regular Session (1967 Acts, p. 847; now appearing in Code of Alabama Recompiled 1958, Title 55, Section 172 (2)) are hereby repealed.
. . . . .
The plaintiff's original complaint, which he filed in the capacity of a citizen and taxpayer, sought declaratory and injunctive relief against the state's fiscal authorities on the ground that the Act contravened Section 98 of the Alabama Constitution of 1901, which provides:
 The legislature shall not retire any officer on pay, or part pay, or make any grant to such retiring officer.
Thereafter, the complaint was amended to allege that Act 343 also violated Section 68 of the Alabama Constitution of 1901 "and also on the general constitutional principle that legislatures can not [sic] appropriate money for gratuities for private purposes." Section 68 states:
 The legislature shall have no power to grant or to authorize or require any county or municipal authority to grant, nor shall any county or municipal authority have power to grant any extra compensation, fee, or allowance to any public officer, servant, or employe[e], agent or contractor, after service shall have been rendered or contract made, nor to increase or decrease the fees and compensation of such officers during their terms of office; nor shall any officer of the state bind the state to the payment of any sum of money but by authority of law; provided this section shall not apply to allowances made by commissioners' courts or boards of revenue to county officers for ex officio services, nor prevent the legislature from increasing or diminishing at any time the allowance to sheriffs or other officers for feeding, transferring, or guarding prisoners.
Former Governors James E. Folsom and John Patterson intervened as parties-defendant. Former Governor Patterson moved to require plaintiff to join Governor George C. Wallace, Lt. Governor Jere Beasley and former Governor Albert Brewer as parties-defendant, however, this motion was not acted upon. The plaintiff and the original defendants have stipulated that of the living former governors eligible for payments under Act 343, only former Governor Folsom had received payments. Governor Wallace, the stipulation states, will not become eligible to receive payments until January, 1979, when his current term as governor expires.
Plaintiff's original complaint was filed on June 9, 1976. Intervenor Folsom filed a motion to dismiss this complaint on June 25, 1976 but did not raise the issue of standing either in that motion or in his answer to the original complaint filed on the same date. The original defendants filed their motion to dismiss the original complaint and their answer thereto on July *Page 763 
1, 1976 and in both they raised the issue of the plaintiff's standing to sue. Then, on July 8, 1976, plaintiff filed an amendment to his complaint by adding a sentence alleging that Act 343 violated both Section 68 of the Alabama Constitution and a general constitutional prohibition against legislative appropriations for private purposes. Thereafter, the original defendants and defendant Folsom did not re-file or amend their motions to dismiss. They did file amended answers denying that Act 343 violated Section 68 or any such constitutional standard. Thus, defendant Folsom in none of his pleadings contested plaintiff's standing. The original defendants, by not renewing or amending their motion to dismiss in order to have it apply to the amended complaint, See Rule 15 (a), ARCP, or by including in their amended answer their allegations against plaintiff's standing which were included in their original answer, did not make plaintiff's standing an issue in their pleadings. An amended pleading pro tanto supersedes a pleading which it amends. United States v. L.D. Caulk Co. (D.C.Del.),114 F. Supp. 939 (1953). By their amended answers to plaintiff's complaint, the original defendants and intervenor Folsom simply substituted those amended answers for their original answers. The liberalized rules of procedure have not eliminated pleadings as the principle means by which parties themselves choose the issues which they wish to litigate. When pleading to amendments, counsel should see that their pleadings incorporate grounds or allegations previously pleaded if they wish to rely upon them, e.g., "comes the defendant and amends his answer to plaintiff's complaint by adding the following . . ." etc. Intervenor Patterson, on the other hand, filed his motion to dismiss on July 19, 1976 which was eleven days after plaintiff's amended complaint was filed, and in that motion he attacked plaintiff's standing to sue. Because the plaintiff's amended complaint was the only one extant at that time, the motion obviously was directed to that amended complaint, and the trial court's overruling of the motions to dismiss thus enabled intervenor Patterson to raise the issue of plaintiff's standing on this appeal.
In his complaint the plaintiff alleged that he was a taxpayer and citizen of the State of Alabama and a duly elected member of the Alabama Senate. He does not rely upon the latter status as authorizing this action, and his taxpayer status is attacked as not entailing a sufficient interest or injury upon which to maintain it. Intervenor Patterson, who has adopted the briefs of the Attorney General under Rule 28 (i), ARAP, and thus may assert their contents, cites many federal cases as authority for his position that plaintiff lacks standing because he has asserted no "direct" or "Particular concrete injury" personal to himself and not shared in common with the public at large. But this argument fails to distinguish the nature of the rights involved here. Federal courts do insist on the distinct injury test when a federal right is asserted. See Schlesinger v.Reservists Committee to Stop the War, 418 U.S. 208, 220,94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); United States v. Richardson,418 U.S. 166, 177, 94 S.Ct. 2940, 41 L.Ed.2d 678, 688 (1974), and generally when review is sought in federal court of a state
court decision on federal law. Cf. Tileston v. Ullman,318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943) and Doremus v. Board ofEducation, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952) withColeman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385
(1939). Those decisions do not limit the authority of state courts to determine for themselves whether to recognize state taxpayer suits, Coleman v. Miller, supra.
In a long line of decisions this Court has recognized the right of a taxpayer to challenge, either as unconstitutional or as not conforming to statute, the expenditure of public funds by county officers. Court of County Revenues v. Richardson,252 Ala. 403, 41 So.2d 749 (1949); Poyner v. Whiddon, 234 Ala. 168,174 So. 507 (1937); Thompson v. Chilton County, 236 Ala. 142,181 So. 701 (1938); Travis v. First Nat. Bank of Evergreen,210 Ala. 620, 98 So. 890 (1924); Reynolds v. Collier, 204 Ala. 38, *Page 764 
85 So. 465 (1920). The right of a taxpayer to challenge the unlawful disbursement of state funds likewise is unquestioned.Goode v. Tyler, 237 Ala. 106, 186 So. 129 (1939) (". . . this Court is committed to the doctrine that a taxpayer may maintain a suit in equity to restrain a state officer in the unlawful disbursement of state funds."); Hall v. Blan, 227 Ala. 64,148 So. 601 (1933); Turnipseed v. Blan, 226 Ala. 549, 148 So. 116
(1933). The latter two cases dealt with the constitutionality of disbursements, while Goode involved expenditures to be made under purported statutory authority. The Supreme Court of Illinois wrote to this principle in Fergus v. Russel, 270 Ill. 304,110 N.E. 130 (1915):
 We have repeatedly held that taxpayers may resort to a court of equity to prevent the misapplication of public funds, and that this right is based upon the taxpayer's equitable ownership of such funds and their liability to replenish the public treasury for the deficiency which would be caused by the misappropriation.
The Attorney General contends in brief that the only parties who should be allowed to bring this suit are state officials charged with the duty of management or disbursement of state funds, or one of the prospective pensioners. This argument was cogently answered in a recent Florida case, Department ofAdministration v. Horne, Fla., 269 So.2d 659 (1972), which is, practically speaking, a "spotted hog" decision. In that case the plaintiffs, who were also members of the Florida Senate, sued in their capacities as taxpayers to enjoin the State Comptroller from disbursing state funds under which the taxpayers claimed were unconstitutional appropriations enacted by the Florida Legislature. When we consider that our own affected public officials, the State's Treasurer, Comptroller and acting Finance Director have joined with prospective pensioners to defend the Act alleged to be unconstitutional, the following language of the Florida Court assumes significance:
. . . If a taxpayer does not launch an assault, it is not likely that there will be an attack from any other source, because the agency involved is usually in accord with the expenditure. There may be instances in which the affected public official might pursue the matter. The Attorney General would be an appropriate officer to bring such a suit, but in some instances this is not done and it is in such cases that it is only the taxpayer's attack which preserves the public treasure.
We conclude that the plaintiff Baker, suing in his capacity as a citizen and taxpayer, has standing to attack the constitutionality of Act No. 343.
In their answers to the amended complaint, all defendants denied that Act No. 343 was unconstitutional under Sections 68 or 98 of the Alabama Constitution of 1901 or under any general constitutional principle. Following the hearing, the trial court decreed:
 From a careful reading of Section 68, it is the opinion of this Court that Act 343 is not effected [sic] and, therefore, inapplicable to this hearing. . . .
. . . . .
 In order to determine what was meant by those that met at the Constitutional Convention of 1901, we should go to the wellhead from which Section 98 springs. Having read contemporary writings at the time when the Section was passed, the Court finds identical wordings in the Official Proceedings of the Constitutional Convention of 1901, State of Alabama, Vol. 2, pages 2645 and 2646, and the Montgomery Advertiser, page 10, July 23, 1901, as follows:
 "Section 57. The Legislature shall not retire any officer on pay or part pay, or make any grant to such retiring officer.
 MR. OATES — It prevents any civil pension list. I move its adoption."
 This Court finds nothing more either in contemporary writings or in court decisions to further elucidate this problem. I am constrained, therefore, to the conclusion that officers — in this situation governors *Page 765 
— past, present, and future cannot receive retirement without a vote of the people amending Section 98 of the Constitution.
. . . . .
Because the plaintiff Baker, who had alleged in his amended complaint that Section 68 was transgressed, did not cross-appeal the decree of the trial court holding Section 68 not affected by Act 343, the defendants Zeigler, Solomon and Allen moved in this Court to strike from plaintiff's briefs, pages 8 through 11, in which he argues that Act 343 is unconstitutional under Section 68. This motion to strike is due to be granted because plaintiff Baker did not appeal the trial court's order which was adverse to him by the timely filing of a notice of appeal under Rules 3 and 4 (a)(1). This leaves for our consideration two issues, viz.: Whether Act 343 is unconstitutional under Section 98, and whether Act 343 is unconstitutional under any general constitutional principle. Because we hold that the Act is unconstitutional under Section 98, we need not decide whether it also offends any general constitutional precept.
In considering the constitutionality of Act No. 343 we are not unmindful of the rule laid down in Ex Parte Bozeman,183 Ala. 91, 63 So. 201 (1913):
 That body having passed the act, the law presumes that the judgment of the Legislature was that the act was constitutional. This judgment of the Legislature, while not conclusive upon the courts, is entitled to, and under the above rule must receive, great weight at the hands of the courts. It is a solemn thing for a court to strike down a statute, and when it does so its reason therefor should be clear and strong and should lead to the irresistible conclusion that the act is invalid.
Consonant with this principle, we must seek to determine what the framers themselves meant by Section 98, and thus we may review the Official Proceedings of the Constitutional Convention of 1901. Such a review has been upheld in City ofMontgomery v. Graham, 255 Ala. 685, 53 So.2d 363 (1951):
 This court may, when construing a provision of the Constitution, look to the debates and proceedings of the Constitutional Convention.
During the Official Proceedings, Governor Dates, a member of the Committee on Legislative Department, made the following statement concerning Section 98 when it was offered to the Convention:
 It prevents any civil pension list. I move its adoption.
The Official Proceedings continue at page 2646: "A vote being taken, the Section was adopted."
It is clear that there was in the movant's mind a relationship between Section 98 and pensions, and it cannot go unnoticed that after he used the phrase, "civil pension list," there were no questions from the delegates nor any further discussion before the vote was taken. Was there a general understanding among the delegates of the meaning of the phrase at the time Section 98 was adopted? Undoubtedly there was such an understanding as we shall demonstrate.
In the first edition on his Commentaries on the Laws ofEngland, Vol. 1, Chap. 8 (Clarendon Press, 1765), Sir William Blackstone discussed extensively the expenses of civil government and the manner in which the revenues for these obligations were obtained. His description of the civil list on page 320 is particularly instructive:
 The expences defrayed by the civil list are those that in any shape relate to civil government; as, the expenses of the household; all salaries to officers of state, to the judges, and every of the king's servants; the appointments to foreign embassadors; the maintenance of the royal family; the king's private expenses, or privy purse; and other very numerous outgoings, as secret service money, pensions, and other bounties: which sometimes have so far exceeded the revenues appointed for that purpose, that application has been made to parliament to discharge the debts contracted on the civil list; . . . (Emphasis added.) *Page 766 
It is also noteworthy that this description is carried over from successive editions into the 1898 edition of Sir William'sCommentaries on the Laws of England, (Rees Welsh Company, Philadelphia) edited by William D. Lewis, (page 294). In none of these references to pensions was any distinction made between persons in and persons out of office. The civil pensions referred to appear all inclusive.
Other publications of that period in our history support this conclusion. Abbott's Dictionary of Terms and Phrases, Vol. 1, page 232 (Little, Brown, Co. 1879) states:
. . . Through many reigns the civil list embraced both the support of the royal person and dignity, and the salaries of civil officers, and pensions. . . .
Rapalje and Lawrence's A Dictionary of American and EnglishLaw, Vol. 1, page 214 (Frederick D. Linn Co. 1888) explains:
. . . Pensions to the amount of £1200 may also be granted by the crown to persons deserving of the public bounty. . . .
Hammonds Commentaries on the Laws of England, Vol. 1, page 587 (Bancroft-Whitney Co. 1890), and Browne's Commentaries onthe Laws of England, Vol. 1, page 108 (West Publishing Co. 1897) define a civil list similarly to Blackstone's original definition.
An Alabama author, Hannis Taylor, has described the civil list to include pensions. In The Origin and Growth of theEnglish Constitution, Part II, Book 7, Chap. III, page 551 (Houghton, Mifflin Co. 1900) he wrote:
 While thus considering the vestiges of political authority still inherent in the person of the sovereign, it will be convenient to briefly epitomize the financial arrangements made by parliament since the Revolution for the maintenance of the royal dignity and household. An account has heretofore been given of the nearly absolute control established by the legislature at the accession of William and Mary over the revenue, involving both the appropriation of supplies and the direction of their expenditure, — a system out of which arose what is known as the "civil list," a term originally used to designate the sources of revenue appropriated to produce a fund to be devoted to the king's personal expenses, the support of the royal household, and to the payment of certain civil officers and pensions embraced in a list that was laid before the house. (Emphasis added.)
Additionally, an exhaustive discussion in the EncyclopaediaBritannica, Vol. 6, page 410 (11th Ed. 1910) explains the history and nature of the civil list:
. . . Moreover, pensions [after the Civil List Act of 1782] were only to be bestowed in the way of royal bounty for persons in distress or as a reward for merit. Another very important change was made by this act: the civil list was divided into classes, and a fixed amount was to be appropriated to each class. The following were the classes: — (Emphasis added.)
. . . . .
6. Pension list. (Emphasis added.)
. . . . .
The nature of the civil list during Queen Victoria's reign is explained:
. . . In addition the queen might, on the advice of
 her ministers, grant pensions up to £1200 per annum, in accordance with a resolution of the House of Commons of February 18th, 1834, "to such persons as have just claims on the royal beneficence or who, by their personal services to the crown, by the performance of duties to the public, or by their useful discoveries in science and attainments in literature and art, have merited the gracious consideration of the sovereign and the gratitude of their country." . . . (Emphasis added.)
After considering the meaning of the phrase, "civil pension list," as it was used by Governor Oates during the Official Proceedings of the Constitutional Convention of 1901, which adopted Section 98, it is our opinion that the language of that *Page 767 
section proscribing any power in the legislature to make any grant to any retiring officer, was meant to prohibit that body from granting a public officer, including, of course, a governor, retirement funds upon his becoming eligible after leaving office.
Contrary to the appellant's insistence that the legislative history of supernumerary judicial positions discloses the legality of the retirement benefits for officers, we respectfully point out that the monetary benefits derived by judicial officers serving as supernumeraries was based upon appointment and the performance of duties. See Title 13, Sections 105 (1)-(4) and Act No. 987, Section 24, Acts of Alabama 1969, Vol. 2, at 1750. Presently the legislature is authorized by the Constitution of Alabama, Art. 6, Section 155, as amended by Act No. 1051 (Amendment No. 328), Acts of Alabama 1973, page 1676, to provide retirement benefits for judges "including supernumerary judges, . . ." The Constitution of Alabama has also been amended to authorize legislative creation of pension benefits for public officers of and in Mobile County. Amendment 150, ratified February 26, 1960; Amendment 192, ratified December 18, 1961. It is clear that similar action is necessary to accomplish the purposes of Act No. 343.
AFFIRMED.
BLOODWORTH, MADDOX, FAULKNER, JONES, ALMON, SHORES and EMBRY, JJ., concur.
TORBERT, C.J., recuses himself.