49 So.2d 199

**CITY OF MONTGOMERY v. MONTGOMERY CITY LINES, Inc.**

**3 Div. 506.**

Supreme Court of Alabama.

Dec. 8, 1949.

Rehearing Granted June 30, 1950.

Rehearing Denied Dec. 14, 1950.

R. S. Hill, Jr., and Walter J. Knabe, of Montgomery, for appellant.

Jack Crenshaw and Wm. S. Duke, of Montgomery, for appellee.

stipulation of facts. The facts are as follows:

"The Montgomery City Lines is a corporation organized and existing under the laws of the State of Alabama; the City of Montgomery is a municipal corporation under the laws of the State of Alabama.

"On the 5th day of December, 1935, the City of Montgomery duly and legally passed an ordinance granting to Montgomery City Lines, Inc., a franchise to operate a bus transportation system within the City of Montgomery, and its police jurisdiction for a period of twenty (20) years. Section 13 of said ordinance was in words and figures, as follows:

" 'Section 13. *License or privilege tax.* The company will pay to the city such reasonable license tax as the city may impose upon it for operating said buses within the corporate limits and police jurisdiction of said City of Montgomery; provided, however, that the amount of such license tax for the first five years of the life of this grant shall not exceed one per cent of the gross revenue derived from the preceding year's operation, or the sum of two thousand dollars ($2,000.00), whichever is the greater; and for the balance of the term of this grant shall not exceed a sum equal to two per cent of the gross revenue derived from the preceding year's business; provided, that if said two per cent of the gross revenue for any of the said years shall not equal the sum of five thousand dollars ($5,000.00), then the company shall pay to the city the said sum of five thousand dollars ($5,000.00), for such years. The license or privilege tax for the first year of the grant of this franchise shall be the sum of two thousand dollars ($2,000.00), which shall be subject to adjustment at the end of said year in accordance with the actual amount of the gross revenues of the company for said year; provided, further, that in the event said company begins operations before the beginning of the license year under the license schedule of the city of Montgomery, the company shall pay for such license tax only the proportion of the amount herein provided to be paid which the period of operation prior to the begin-

LIVINGSTON, Justice.

This is a bill for a declaratory judgment submitted to the Circuit Court, in Equity, of Montgomery County upon an agreed

ning of said license year bears to twelve months.

" 'The license or privilege tax herein provided to be paid shall be the sole and exclusive tax which said company shall pay for the privilege of conducting its said business within the corporate limits of Montgomery, except that nothing herein contained shall relieve said company from paying ad valorem taxes upon its physical properties and such tax as may be levied upon the sale or consumption of gasoline, oil and other motor vehicle fuel.'

"For the past several years the Montgomery City Lines has been operating its bus transportation system within the City of Montgomery and also outside of the corporate limits of the City of Montgomery, Alabama, but within the police jurisdiction of the city; some passengers of the Montgomery City Lines pay for transportation outside of the corporate limits of the city, but within the police jurisdiction.

"At all times material herein, there were in force and effect in the City of Montgomery and applicable to the City of Montgomery, as well as other municipal Corporations, certain statutes, the pertinent ones being Sections 733 and 745 of Title 37 of the Code of Alabama of 1940, which reads as follows:

" '733. *Licenses, general.* Any city or town within the State of Alabama may fix and collect licenses for any business, trade or profession done within the police jurisdiction of such city or town but outside the corporate limits thereof; provided, however, that the amount of such licenses shall not be more than one-half the amount charged and collected as a license for like business, trade or profession done within the corporate limits of such city or town, fees and penalties excluded. Provided, further, that when the place at which any such business, trade or profession is done or carried on within the police jurisdiction of two or more municipalities which levy the licenses thereon authorized by this section, such licenses paid to and collected by that municipality only whose boundary measured to the nearest point thereof, is closest to such business, trade or profession. Provid-

ed that this section shall not have the effect to repeal or modify the limitations in this article relating to railroad, express companies, sleeping car companies, telegraph companies, telephone companies and public utilities, and insurance companies and their agents.

" '745. *Public Utilities.* The maximum amount of privilege or license tax which the several municipalities within the state may annually assess and collect of persons, operating (electric, hydro-electric) street railroad, electric light and power companies, gas companies, water works companies, pipe line companies for transporting or carrying gas, oil, gasoline, water or other commodities, gas distributing companies whether by means of pipe lines or by tanks, drums, tubes, cylinders, or otherwise, heating companies or other public utility, incorporated under the laws of this state or any other state, or whether incorporated at all or not, except telephone and telegraph companies, railroad and sleeping car companies, and express companies which are otherwise licensed, shall not exceed three percent of the gross receipts of the business of such persons, in the municipality for the preceding year. Provided that this shall not affect any existing contract, between any municipality and any public utility operating therein'.

"The Montgomery City Lines paid an annual license or privilege tax under provisions of section 13 above set forth, for the first five years of said grant equal to 1% of the gross receipts of its operations in the City of Montgomery and its police jurisdiction. Upon the expiration of said five years and on, towit, December 5, 1940, the City of Montgomery did not pass any ordinance establishing what was a reasonable license tax to be paid after the expiration of the first five year period. · During the fall of 1941 the question was raised as to whether the provisions of section 13 of the ordinance of December 5, 1935, required the city of Montgomery to levy an annual license tax, or whether the tax was automatically fixed at 2%. Declaratory judgment proceedings were had before the Circuit Court of Montgomery County, Alabama, by which proceedings the Circuit

Court of Montgomery County rendered a decree declaring the rights of the parties, construing the provisions of said section 13 of the ordinance of December 5, 1935, and decreeing that the Montgomery City Lines, Inc., was not required by said franchise ordinance to pay a license tax equal to two per cent of gross proceeds, but only such reasonable license tax as the City of Montgomery might impose, not to exceed two per cent of gross receipts; a copy of which said decree is hereto attached as Exhibit 'A', and made a part hereof as fully as if set out herein.

"Pursuant to said decree of the Circuit Court of Montgomery County, Alabama, the Board of Commissioners of the City of Montgomery made a full and complete investigation to determine what would be a reasonable annual license or privilege tax to be levied by the City of Montgomery pursuant to the terms of the franchise ordinance of December 5, 1935. Said investigation included numerous conferences, at which time one or more of the commissioners would meet with representatives of the Montgomery City Lines, Inc., including the superintendent, general counsel, and local attorney. At said conferences members of the Board of Commissioners examined statements, records, and other papers of the Montgomery City Lines, pertaining to the income, gross receipts, gross profits, wages of bus drivers and mechanics, number of passengers carried, number and type of buses, number of routes, number of schedules, and routes without the corporate limits but within the police jurisdiction. During the discussions and on towit, the 23rd day of September, 1941, the commissioners expressed a desire that: (1) the rates charged by the company remain the same; (2) that business of operating a route, extending from the corporate limits to the Veterans' Administration facility be continued; (3) the business of operating a route, extending from the corporate limits to Gunter Field to be continued; (4) the wages of bus drivers and mechanics to be increased substantially; and (5) more, larger and better buses be installed. The representatives of the Montgomery City Lines informed the Board of Commissioners that such desires

could and would be fulfilled in the event the license or privilege tax was fixed at a reasonable rate for the duration of the grant. Thereafter on September 23, 1941, the said Board of Commissioners of the City of Montgomery, Alabama, at a regular meeting, duly and legally adopted an ordinance, levying against the Montgomery City Lines, Inc., and imposing upon it, for the term of the grant, as provided by the ordinance of December 5, 1935, an annual license or privilege tax of a sum equal to one percent of the gross revenue derived by said company from the preceding year's operations within the city and police jurisdiction of the City of Montgomery. A copy of the minutes of the Board of Commissioners of September 23, 1941, is hereto attached as Exhibit 'B', and made a part hereof as fully as if set out herein.

"In reliance upon said ordinance of September 23, 1941, and contingent upon other business factors the Montgomery City Lines has: (1) maintained the same schedule of rates charged at the time of said conferences and at the time of the passage of said ordinance; (2) continued the business of operating a route, extending from the corporate limits to the Veterans Administration Facility; (3) continued the business of operating a route from the corporate limits to Gunter Field; (4) the wages of bus drivers and mechanics were increased substantially almost immediately after said ordinance was adopted and rates have been increased on three occasions since that first increase, and bus drivers have received a thirty three and one third per cent increase over the wages they were receiving at the time of the adoption of said ordinance, while the mechanics have received over a fifty per cent increase over the wages they were receiving at the time of the adoption of said ordinance; and (5) the number of buses operating has increased substantially and larger buses with increased seating capacity have been put in use. Further, the Montgomery City Lines did pay the City of Montgomery for the year 1941 the license or privilege tax of one per cent of gross receipts provided in said ordinance of September 23, 1941, and which said sum was accepted by the City of Montgomery;

that complainant has each year up to the filing of these proceedings paid to the City of Montgomery the license or privilege tax as set by said ordinance of September 23, 1941.

"On December 13, 1944, David E. Dunn and William P. Screws, as commissioners of the City of Montgomery, undertook to pass an ordinance establishing and imposing a license or privilege tax upon the Montgomery City Lines of a sum equal to two per cent of the gross revenue derived by said company from the preceding year's operation within the City and police jurisdiction of the City of Montgomery, for the remainder of the term of the grant of its franchise; that ordinance or purported ordinance was passed without notice to Montgomery City Lines, without a hearing or an opportunity to be heard, and without any investigation or finding other than the general knowledge, of an increased number of passengers carried, but without any investigation of the books, records, increased wages, increased taxes, and general increased operating costs of the bus company, and without any conference or discussion of the proposed increase with any official or officials of the Montgomery City Lines, as to what constituted a reasonable license or privilege tax to be imposed upon the Montgomery City Lines. A copy of the minutes of the meeting of the Board of Commissioners of the City of Montgomery of December 13, 1944, is hereto attached as Exhibit 'C' and made a part hereof as fully as if set out herein.

"The gross receipts and net profits of Montgomery City Lines from the operation of its business under said franchise ordinance of 1935 were as follows:

| Year | Receipts | Profits |
|------|----------|---------|
| 1937 | 305,848.75 | 34,940.38 |
| 1938 | 317,249.64 | 39,835.13 |
| 1939 | 357,514.30 | 50,080.26 |
| 1940 | 413,648.01 | 46,858.54 |
| 1941 | 502,367.55 | 62,300.19 |
| 1942 | 724,223.10 | 51,937.60 |
| 1943 | 952,053.36 | 54,343.66. |

"Among the initial routes established in said franchise ordinance adopted December 3, 1935, granting to said Montgomery City Lines the right to establish, maintain and operate a motor bus transportation system in the City of Montgomery, there was established Route #8, designated as the Boyleston Route; that during the year 1937, the Montgomery City Lines kept continuous and accurate accounts of the cost of its operation of said Boyleston Route, and it was shown by said accounts that the entire revenue received from the operation of said Boyleston Route since the beginning of service thereon had been less than the cost of said service; that the Montgomery City Lines reported this fact to said Board of Commissioners, and on the 2nd day of February, 1937, the said Board of Commissioners adopted an ordinance entitled:

" 'An Ordinance to amend section nine of an ordinance entitled "An Ordinance granting to the Montgomery City Lines, Inc., its successors and assigns, the authority, right and privilege to establish, maintain and operate a motor bus transportation system in the City of Montgomery, Alabama, for the transportation of passengers only, and fixing the terms and conditions of such grant," ' adopted by the Board of Commissioners on the 3rd day of December, 1935, a copy of which said ordinance is hereto attached and marked 'Exhibit D' and made a part hereof, which said ordinance authorized the Montgomery City Lines to charge for transportation entirely within the corporate limits:

" '(a) Fare to and from Court Square and intermediate points to and from city limits, five cents (5¢), with free transfer privilege within the city limits of Montgomery.'

"And a separate and distinct fare charged and collected without the corporate limits for transportation without the corporate limits but within the police jurisdiction, which such separate and distinct fare was established as:

" '(b) Fare from and to city limits and intermediate points to and from Chisholm and Boyleston, five cents (5¢), without transfer privileges as there are no connecting lines on this portion of Route 8;'
and a separate and distinct fare to be

charged and collected without the corporate limits for transportation beyond the corporate limits but within police jurisdiction, when such transportation was begun within the corporate limits:

" '(c) Continuous fares from Court Square or Boyleston to points beyond city limits from such termini, eight cents (8¢), with free transfer privileges to all lines within the city limits of Montgomery. All passengers shall pay the usual five cents (5¢) fare on entering coaches. The zone points shall be the city limits and each coach may stop there and collect three cents (3¢) for all passengers already on the coach and continuing their passage beyond said point;' that said Montgomery City Lines has not charged said fare of three cents (3¢); but that such action on the part of the Board of Commissioners recognized and established that Montgomery City Lines was operating a business wholly without the corporate limits of the City of Montgomery but within the police jurisdiction, such business consisting of transporting passengers from points wholly without the corporate limits but within the police jurisdiction to other points wholly without the corporate limits but within the police jurisdiction, and at no time during such transportation being carried within the corporate limits, for which a separate and distinct fare was charged and collected without the corporate limits but within the police jurisdiction, and such business also consisting of transporting passengers from a point immediately without the corporate limits to another point without the corporate limits but for a separate and distinct fare, charged and collected without the corporate limits but within police jurisdiction, when such transportation was begun within the corporate limits and a separate and distinct fare had already been charged and collected for such transportation from a point within the corporate limits to a point at the corporate limits.

"During the year 1940, the three members of the Board of Commissioners of the City of Montgomery made numerous requests for and insisted that the Montgomery City Lines establish a bus route serving communities along the Atlanta Highway and particularly the Veterans Administration Facility, and also a bus serving the communities along the Wetumpka Highway and particularly the Gunter Field Airport; that said proposed routes would serve areas lying without the corporate limits of the City of Montgomery but within the police jurisdiction; that said commissioners desired that said new routes connect with the terminal point at Capitol Heights of the present routes lying within the corporate limits of the City of Montgomery; the revenue that could be reasonably expected to be realized from said routes so added would be grossly inadequate to cover the cost of maintaining such additional proposed routes as a part of the then present system; that said commissioners suggested that the Montgomery City Lines institute such proposed routes and operate the proposed routes in the same manner as that set forth by the commissioners for the Boyleston Route in its ordinance of February 2d, 1937, the details of which are set out in paragraph 12, and that a fare of five cents (5¢) be charged on each of said proposed routes for the transportation of any passengers from a point immediately without the corporate limits of the City of Montgomery to any other point without the corporate limits but within the police jurisdiction; that, in compliance with the request and insistence of said commissioners, each of such routes was established and placed in operation in 1940 upon the basis suggested by said commissioners as above set out, and said routes have been operating continuously since that date, charging a separate and distinct fare for the carrying of passengers without the corporate limits of the City of Montgomery but within the police jurisdiction, all of which was well known to the said Board of Commissioners.

"The City of Montgomery through its duly authorized officers, at the time of the filing of the bill in this cause, was attempting and is now attempting to enforce said ordinance of December 13, 1944 against the Montgomery City Lines, and is attempting to collect from Montgomery City Lines an annual license or privilege tax at a sum equal to 2% (two per cent) of the gross revenue derived by said company from the preceding year's operations within the city

and within the police jurisdiction of the City of Montgomery. After the filing of the bill in this cause, on February 15, 1945, the Montgomery City Lines paid to the City of Montgomery $10,588.77 as license for the year 1945, being an amount equal to one per cent (1%) of the gross receipts of Montgomery City Lines within the city and police jurisdiction of the City of Montgomery during the year 1944; said amount being paid under the agreement and understanding that if the court should determine that the Montgomery City Lines was liable for a tax of 2% on the gross receipts in the city and police jurisdiction during the year 1944, the balance would be promptly paid, but without interest or penalties. No agreement being made for subsequent years, the City of Montgomery demanded license tax equal to two per cent (2%) of gross revenue for the preceding year from operations within the city and police jurisdiction, and the Montgomery City Lines paid under protest the following amounts for license tax to the City of Montgomery:

January 31, 1946 — $21,737.65 — 1946 License
January 28, 1947 — $21,199.63 — 1947 License
January 30, 1948 — $19,868.40 — 1948 License;

all of said payments being made under protest and each of said payments representing two per cent (2%) of gross revenue from operations in the city and police jurisdiction during the preceding year. Action on the law side of the docket for the recovery of such taxes paid under protest during the years 1946 and 1947, is now pending in the Circuit Court of Montgomery County, at Law.

"It is agreed that any part of Title 62, Article 12, Subdivision 3, sections 558–589, of the 1940 Code of Alabama, which sections provide for the organization of the City of Montgomery, which the court considers competent, may be considered by the court.

"The parties hereto agree that witnesses could be secured who would testify if permitted, in accordance with the foregoing facts. Neither party admits the relevancy of any statement, conclusion, or contention of the opposite party. Each party desires the court to consider only such facts as the court finds to be relevant and competent in reference to the issues here involved."

The trial court entered the following decree:

"It is ordered, adjudged and decreed as follows:

"(1) That the proposed ordinance of the City of Montgomery, Alabama, dated December 13, 1944, be, and the same is hereby declared to be null and void and of no effect, and the respondents are perpetually enjoined from enforcing or attempting to enforce the same.

"(2) The ordinance of the City of Montgomery dated September 23, 1941, be, and the same is hereby declared to be the license ordinance under which the Montgomery City Lines, Inc., is operating.

"(3) That said ordinance of September 23, 1941, be, and the same shall remain in full force and effect throughout the term of the franchise.

"(4) That the Montgomery City Lines, Inc., recover of the City of Montgomery any sums paid in excess of the license required by said ordinance dated September 23, 1941, together with legal interest thereon.".

The question of primary importance is the validity of the city ordinance of December 13, 1944, imposing a license or privilege tax upon the Montgomery City Lines of a sum equal to two per cent of the gross revenue derived by said company from the preceding year's operation within the city and police jurisdiction of the City of Montgomery for the remainder of the term of the grant of its franchise.

The principles of law controlling the answer to the foregoing question were fully settled in the recent case of Alabama Gas Co. v. City of Montgomery, 249 Ala. 257, 30 So.2d 651. From an early period, beginning with the case of Van Hook v. City of Selma, 70 Ala. 361, 45 Am.Rep. 85, our cases are to the effect that "cities are not authorized under the Constitution to levy a license tax on business located wholly within its police jurisdiction and outside the city limits for the purpose of raising general revenue either directly or indirectly; but in levying such an assessment, the amount must be so fixed as to reflect reasonable compensation for the expense of municipal supervision over the particular busi-

ness or vocation at the place where it is licensed." Hawkins v. City of Prichard, 249 Ala. 234, 30 So.2d 659, 662. See, also, City of Andalusia v. Fletcher, 240 Ala. 110, 198 So. 64; Alabama Power Co. v. City of Carbon Hill, 234 Ala. 489, 175 So. 289; City of Prichard v. Richardson, 245 Ala. 365, 17 So. 2d 451.

The agreed facts demonstrate that the ordinance of December 13, 1944, attempts to impose a license tax on business done within the city limits and the police jurisdiction thereof of two percent of the gross receipts of the business done both within the city limits and without the city limits, but within the police jurisdiction. This attempted levy is plainly in excess of that provided for in section 733, Title 37, Code of 1940. Alabama Gas Co. v. City of Montgomery, supra.

An ordinance in excess of the power of the municipality is void as a whole and not merely as to the excess. The court cannot substitute its judgment for that of the municipal authorities and fix a smaller charge which may be regarded as reasonable.— City of Prichard v. Richardson, supra, and cases therein cited.

The trial court correctly ruled that the ordinance of December 13, 1944, is null and void and of no effect.

No language in section 13 of the ordinance of 1935 can be construed as an agreement on the part of the Montgomery City Lines to pay a license tax of two percent on the gross receipts of the preceding year's business. As a matter of fact, the agreement was to pay a reasonable license tax of not more than two percent, or $5,000.00, whichever was the greater.

The agreed statement of facts indicates the conditions and circumstances under which the ordinance of September 23, 1941, was adopted and in which the license tax was fixed at a sum equal to one per cent of the gross revenues derived from the preceding year's business within the city limits and the police jurisdiction thereof and to extend for the term of the grant, that is, the duration of the franchise. It is further agreed that the Montgomery City Lines has performed all agreements made with the city at the time of the passage of said ordinance, which agreements superinduced at least in part the passage of the said ordinance.

The trial court decreed "That said ordinance of September 23, 1941, be, and the same shall remain in full force and effect throughout the term of the franchise." This ruling presents the question of whether the city had the power to bind itself by contract not to increase the license tax for doing business in the city and its police jurisdiction during the then remaining term of the grant. It is to be noted of course that the ordinance of September 23, 1941, does not exact the limit of such tax as provided by section 745, supra.

In the case of Mayor and Aldermen of Birmingham v. Birmingham Water Works Co., 139 Ala. 531, 36 So. 614, 615, 101 Am. St.Rev. 49, it was held that the provisions in a contract between a municipal corporation and a water works company, by which the municipality agreed to limit the amount of license tax to be exacted of the water works company during the term of the contract, if made without legislative authority, is *ultra vires,* void and unenforceable. It was there said: "It is not to be presumed that it was necessary for the city to barter or contract away its taxing power in order to provide for a supply of water, and the implication of such a power must be a necessary one. Our attention has not been directed to any provision of the charter or to any legislative enactment out of which such implied power could arise."

In Phenix City v. Alabama Power Co., 239 Ala. 547, 195 So. 894, 899, it was said:

"In the same connection, in 1924, the subject was discussed by Justice Holmes for the Supreme Court of the United States, which was adopted by that court in the case of City of Opelika v. Opelika Sewer Co., 265 U.S. 215, 44 S.Ct. 517, 518, 68 L.Ed. 985, where he states: 'But we see no reason to doubt that the Legislature without impairing its power to revoke may give a city power to make a contract from which the city of its own motion may not recede.'

"The power of the State to confer in such terms on a city the right to make contracts and grant franchises as that the city may

not revoke them has been recognized in many cases. St. Cloud Public Service Co. v. St. Cloud, 265 U.S. 352, 44 S.Ct. 492, 68 L.Ed. 1050; Railroad Comm. of State of California v. Los Angeles Ry. Corp., 280 U.S. 145, 50 S.Ct. 71, 74 L.Ed. 234; City of Bessemer v. Bessemer City Water Works, 152 Ala. 391, 44 So. 663; Mobile Electric Co. v. City of Mobile, 201 Ala. 607, 79 So. 39, L.R.A.1918F, 667; City of Gadsden v. Mitchell, 145 Ala. 137, 157, 40 So. 557, 6 L.R.A., N.S., 781, 117 Am.St.Rep. 20. Though sometimes subject to revocation by the State: Alabama Water Co. v. City of Attalla, 211 Ala. 301, 100 So. 490; Union Dry Goods Co. v. Georgia Public Service Corp., 248 U.S. 372, 39 S.Ct. 117, 63 L.Ed. 309, 9 A.L.R. 1420; Oppenheim v. City of Florence, 229 Ala. 50, 57, 155 So. 859. A franchise granted by a city often becomes a contract according to its terms, but subject to applicable restrictions prescribed by law or the Constitution. 12 Am.Jur. 40, section 408, page 45, section 414; Town of New Decatur v. American Tel. & Tel. Co., 176 Ala. 492, 58 So. 613, Ann.Cas.1915A, 875; Birmingham & Pratt M. Street Railway Co. v. Birmingham Street Railway Co., supra (79 Ala. 465, 58 Am.Rep. 615); City of Walla Walla v. Walla Walla Water Co., 172 U.S. 1, 19 S.Ct. 77, 43 L.Ed. 341; Columbus Railway, Light & Power Co. v. Columbus, 249 U.S. 399, 39 S.Ct. 349, 63 L.Ed. 669, 6 A.L.R. 1648; City of Owensboro v. Owensboro Water Works Co., 243 U.S. 166, 37 S.Ct. 322, 61 L.Ed. 650."

It is clear enough from the agreed statement of facts that the city intended to make a binding contract by the adoption of the ordinance of September 23, 1941 limiting the amount of license taxes to be paid by the Montgomery City Lines for the then remaining term of the grant. The question is did the city have the legislative authority to do so?

The Birmingham Water Works case, supra, dealt with a contract made on June 2, 1888. Complaint was there made of an increase in the amount of the license tax from $500.00 to $1000.00 per annum in the year 1900 in violation of the contract. Several changes in both the Constitution and the statutes have been made since the time upon which that decision rests.

Section 220 of the Constitution of 1901, provides: "No person, firm, association, or corporation shall be authorized or permitted to use the streets, avenues, alleys, or public places of any city, town or village for the construction or operation of any public utility or private enterprise, without first obtaining the consent of the proper authorities of such city, town or village."

In the case of City of Montgomery v. Orpheum Taxi Co., 203 Ala. 103, 82 So. 117, it was said: "Section 24, art. 12, of the Constitution of 1875, the predecessor in partial purpose of section 220 of the present organic law, provides that 'no street passenger railway shall (should) be constructed within the limits of any city or town, without the consent of the local authorities.' It will be noted that the quoted section of the previous Constitution interposed its prohibition against the construction of a street passenger railway anywhere within the limits of the municipality, not confining the inhibition to public ways and places as in the present organic law, unless the local authorities consented therto. The motive inspiring the limited prohibition set forth in the previous Constitution was to preserve against legislative action a measure of local self-government, a character of self-determination, through 'local authorities,' with respect to the construction of a street passenger railway within the limits of any town or city in this state. This was the fundamental idea illustrated in section 24. The makers of the succeeding Constitution of 1901, through the committee on municipal corporations, accepted the idea thus originally expressed in the earlier organic law, and greatly amplified its application and effect, with respect to streets, etc., in the provisions of section 220. The motive was the same, viz. to restrict the power of the Legislature to the extent that it could not enact laws affecting or governing the use of local public ways that did not recognize or respect the thus permanently preserved rights of the local authorities to determine, according to their judgments, whether or not the ways and places mentioned in section 220

should be used for the purposes prescribed in section 220. There is no room for doubt or debate as to the motive inspiring the makers of the organic law, or the general purpose they entertained and undertook to effect."

Sections 221 and 228 are new to the Constitution of 1901, and read as follows:

221. "The legislature shall not enact any law which will permit any person, firm, corporation, or association to pay a privilege, license, or other tax to the State of Alabama, and relieve him or it from the payment of all other privilege and license taxes in the state."

228. "No city or town having a population of more than six thousand shall have authority to grant to any person, firm, corporation, or association the right to use its streets, avenues, alleys, or public places for the construction or operation of water works, gas works, telephone or telegraph line, electric light or power plants, steam or other heating plants, street railroads, or any other public utility, except railroads other than street railroads, for a longer period than thirty years."

"The purpose of the people when they adopted the above quoted section 221 of the Constitution is, when read in the light of the legislative history of the State, plain and unmistakable. The legislature had not been unaccustomed to pass acts which required of those who desired to carry on a particular character of business in the State for which a license tax might be lawfully required to pay a license tax for the State *only* and in which the State only participated. Cities and towns were thus frequently left without power to derive *any revenue* in the shape of license taxes from those to whom they were constantly furnishing municipal protection. It was this inequality which said section 221 of the Constitution was intended to prevent." Ex parte Bozeman, 183 Ala. 91, 96, 63 So. 201; City of Birmingham v. Southern Express Co., 164 Ala. 529, 51 So. 159; Exchange Drug Co. v. State Tax Com., 218 Ala. 115, 117 So. 673.

In the case of Phenix City v. Alabama Power Co., supra, in support of the assertion that the State has conferred on cities the power to grant franchises, but not the power to revoke them, section 2016 of the Code of 1923 is cited. That section, now section 439, Title 37, Code of 1940, reads: "The council shall regulate the use of the streets for the erection of telegraph, telephone, electric and all other systems of wires and conduits, and may require the same to be placed underground if deemed necessary for the public convenience and safety, and generally to control and regulate the use of the streets for any and all purposes. The city council may sell or lease in such manner as it may deem advisable any franchise which it has power to grant, and the moneys received therefor shall be paid into the city treasury."

This section was not in the Code when the Birmingham Water Works case, supra, was decided.

At all times pertinent to this inquiry, what is now section 563, Title 62, Code of 1940, was in essential part applicable to the City of Montgomery. See, General Acts 1931, p. 99; General Acts 1939, p. 832. Section 563, supra, provides: "No resolution, by-law or ordinance granting to any person, firm or corporation any franchise, lease or right to use the streets, public highways, thoroughfares, or public property of the city, either in, under, upon, along, through or over same shall take effect and be in force until thirty days after the final enactment of same by the board of commissioners and publication of said resolution, by-law or ordinance in full once a week for three consecutive weeks, in some daily newspaper published in said city, which publication shall be made at the expense of the person applying for said grant. Pending the passage of any such resolution, by-law or ordinance, or during the time intervening between the final passage and the expiration of the thirty days during which publication shall be made, as above provided, the legally qualified voters of said city may, by written petition or petitions, addressed to said board of commissioners, object to such grant, and if, during said period, such written petition or petitions signed by at

least one thousand legally qualified voters of such city shall be filed with said board of commissioners, said board shall forthwith order an election at which election the legally qualified voters of said city shall vote for or against the proposed grant as set forth in the said by-law, resolution or ordinance. In the call for said election, the said resolution, by-law or ordinance making said grant, shall be published in said city, by one publication. If at such election, the majority of the votes cast shall be in favor of said ordinance, and the making of the said proposed grant, the same shall thereupon become effective, but if a majority of the votes so cast shall be against the passage of said resolution, by-law or ordinance and against the making of said grant, the said by-law, resolution or ordinance shall not become effective, nor shall it confer any rights, powers, or privileges of any kind, and it shall be the duty of the said board of commissioners after such result of said election shall be determined to pass a resolution or ordinance to that effect. No grant of any franchise, or lease, or right of user, or any other right, in, under, upon, along, through or over the streets, public highways, thoroughfares or public property of such city shall be made or given, nor shall any such rights of any kind whatever be conferred upon, any person, except by resolution or ordinance, duly passed by the board of commissioners, at some regular or adjourned public meeting and published as above provided for in this section; nor shall any extension or enlargement of any such rights or powers previously granted be made or given, except in the manner and subject to all the conditions herein provided for, as to the original grant of same. It is expressly provided, however, that the provisions of this section shall not apply to the grant of sidetracks or switching privileges to any railroad or street car company for the purpose of reaching and affording railway connections and switch privileges to the owners or users of any industrial plant, store or warehouse; provided further that said sidetrack or switch shall not extend for a greater distance than one thousand three hundred and twenty feet. All franchises or privileges heretofore granted, which are not in actual use or enjoyment or which the grantees thereof have not in good faith commenced to exercise, are hereby declared forfeited and of no validity and it shall be the duty of the commission to carry out the provisions of this section by the enactment of ordinances repealing said franchises, provided this section shall not apply to any franchise in which the ordinance granting the same shall have fixed a time within which work shall commence or be completed thereunder and such time shall not have expired. No exclusive franchise shall ever be granted and no franchise shall ever be granted for a longer term than thirty years, and no franchise shall be renewed before one and one-half years of its expiration. When any person holding a franchise for the location, construction or operation of a railroad over a portion of any street and said franchise has not expired, shall subsequently apply for a franchise to locate, construct or operate a railroad on any portion of the same street or upon any other street in connection therewith, said second franchise shall only be granted for the unexpired term of the first franchise. *No such grant, right, privilege or franchise shall ever be made to any person, firm, or corporation or association unless it provides for adequate compensation or consideration therefor to be paid to such city, and in addition to any other form of compensation any such grantee shall pay annually such fixed charge as may be prescribed in the franchise ordinance. Whenever any such grant, right, privilege or franchise provides for the payment of a percent of the gross receipts, such grantee shall make and report to the commission all its gross earnings once in six months, and pay into the city treasury the amounts due such city at the time said report is made. Said commission shall also have access to and the right to examine and have examined all books, receipts, files, records and documents of any such grantees to verify the correctness of such semi-annual statements and to correct the same if found to be erroneous. If such statement of earnings be incorrect, then such*

*payment shall be made upon such corrected statement.* Every ordinance granting any franchise may provide that at the expiration of the period for which the franchise was granted, or at any time before, as stated in the ordinance, the city at its election and upon the payment of a fair valuation therefor, to be made in the manner provided in the ordinance making the grant, may purchase and take over to itself, the property and plant of the grantee in its entirety, but in no case shall the value of the franchise of the grantee be considered or taken into account in fixing such valuation. Or it may be provided in the ordinance granting any franchise that the property and plant of the grantee shall at the expiration of the period for which the franchise was granted, become the property of the city, without any compensation to the grantee. Every ordinance granting any franchise may further provide that upon the payment by the city of a fair valuation in the manner provided in the ordinance, the plant and the property of the grantee shall become the property of the city by virtue of the grant in payment thereunder, and without the execution of any instrument or conveyance. Or in case it is provided in the ordinance granting any franchise that the property and plant of the grantee shall at the expiration of the period for which it was granted, become the property of the city without any compensation to the grantee, the property and plant of the grantee shall then become the property of the city by virtue of the grant and without the execution of any instrument or conveyance. No franchise granted by the city shall ever be leased, assigned or otherwise alienated without the express consent of the city, and no dealing with the lessee or assignee on the part of the city to require the performance of any act or payment of any compensation by the lessee or assignee, shall be deemed to operate as such consent. Where the city is the owner of and operates a public utility plant, no franchise shall be granted to any person to operate any competitive plant unless approved first by a vote of the majority of the qualified electors of such city, at an election held in accordance with the provisions of this subdivision." (Italics supplied.)

By General Acts of 1919, pages 282, 428, Schedule 89, the Legislature of Alabama for the first time enacted a special section regulating licensing of public utilities, and including as the last sentence thereof these words: "Provided that this shall not affect any existing contract between any municipality and any public utility operating therein."

This same section and specific provision was brought forward as section 2162 into the Code of 1923. A similar provision is found in the General Acts of 1927, page 166; General Acts 1935, pages 325–326, section 140, and section 745, Title 37, Code of 1940.

While the proviso in section 745, supra, is not a specific grant of legislative authority to municipalities to contract in respect to license taxes, we think that it is either a legislative recognition that such authority exists or a validation of contracts already made without such authority. If the proviso is merely a provision for validating existing contracts made without authority, then the contract here involved would not come within its protection because made after the adoption of the Code of 1940. But the proviso alone is not determinative of whether the city had legislative authority to make the contract contained in the ordinance of September 23, 1941.

All statutes relating to the grant of legislative authority to the City of Montgomery in respect to granting of franchises to public utilities, the licensing of public utilities and the use and control of its streets, must be considered in *pari materia*, forming one whole harmonious plan, none of whose provisions must conflict and, if there is an irreconcilable conflict, that which was last takes precedence. Patterson v. Jefferson County, 238 Ala. 442, 191 So. 681; Donoghue v. Bunkley, 247 Ala. 423, 25 So.2d 61; State ex rel. Roundtree v. Summer, 248 Ala. 545, 28 So.2d 565.

In interpreting these statutes to determine the legislative intent, there are

certain fundamental rules of construction which this Court has announced. The fundamental rule of construction is to ascertain and give effect to the intention of the legislature as expressed in the statute. Street v. Cloe, 207 Ala. 631, 93 So. 591; State ex rel. Wilkinson v. Lane, 181 Ala. 646, 62 So. 31. And in determining the intent, the rule as laid down by this Court in Mooring v. State ex rel. Braswell, 207 Ala. 34, 91 So. 869, 871, and followed in Ex parte Miles, 248 Ala. 386, 27 So.2d 777, is: "In construing laws it is the judicial disposition, as well as duty, to consider all related parts and provisions thereof that may contribute to disclose the legislative intent; and in so doing to give operation and effect to every provision, if fairly possible." See, also, Leath v. Wilson, 238 Ala. 577, 192 So. 417.

■ The purpose of a statute will be illustrated by its origin, countemporaneous history, the prior condition of the law, as well as the general powers and course of legislation. State ex rel. Fowler v. Stone, 237 Ala. 78, 185 So. 404.

The italicized portion of section 563, supra, which we will not here repeat, considered in the light of the constitutional changes above referred to, and in connection with the other statutory provisions named above, convince us that the city had the legislative authority to enter into the contract contained in the ordinance of September 23, 1941, and may not now recede therefrom without the consent of the Montgomery City Lines. The Birmingham Water Works case, supra, is not controlling under the agreed facts of this case.

The judgment of the trial court is affirmed.

Affirmed.

BROWN, FOSTER and SIMPSON, JJ., concur.

## On Rehearing.

FOSTER, Justice.

The question briefly stated on this appeal is whether the contract made by the appellee, a public utility, and the City of Montgomery on September 23, 1941, imposing on the utility an annual license or privilege tax in a sum equal to one percent of the gross revenue derived by it from the operations of the preceding year within the city and within the police jurisdiction of the city is valid and binding on the city for the balance of the period of a franchise granted to it by the city extending from December 5, 1935 for twenty years. There was adequate consideration for the contract.

■ On December 13, 1944, the city by ordinance undertook to impose an annual license tax upon the utility in a sum equal to two percent of the gross revenue derived from the preceding year's operations within the city and police jurisdiction thereof for the remainder of the term of the franchise. That feature of the license ordinance of December 13, 1944, which imposes a license tax in a sum equal to two percent of the gross revenue derived by the company from operations within the police jurisdiction of the city cannot be supported. Alabama Gas Co. v. City of Montgomery, 249 Ala. 257, 30 So.2d 651; Van Hook v. City of Selma, 70 Ala. 361, 45 Am.Rep. 85.

We do not think that this results in striking down the entire ordinance if the balance is legal. In the City of Prichard v. Richardson, 245 Ala. 365, 17 So.2d 451, the question only related to a license tax for doing business in the police jurisdiction. The Court held that the license was for revenue as well as police regulation and therefore void. And in doing so held that the court could not fix an amount for police regulation since that was for the city alone. That was of course a sound theory, but not here applicable.

The city here fixed a license tax of two percent of business done within the city limits and the police jurisdiction. The legal effect is to cut out the two percent on receipts from business done in the police jurisdiction, leaving in force the two percent on receipts from business done in the city limits, if the latter is otherwise valid. The validity of that feature of the ordinance of 1944 depends upon the validity of the contract of September 23, 1941, by

which the city agreed in substance to a license tax against the utility of one per-cent of the receipts from the preceding year's business done in the city and in the police jurisdiction, covering the balance of the period of the franchise. We will not oppose the view that the proceedings of September 23, 1941, and subsequent conduct of the parties with respect to it are suffi-cient to create a contract, if the city could legally make such a contract.

In the case of Mayor, etc., of Birming-ham v. Birmingham Water Works, 139 Ala. 531, 36 So. 614, 101 Am.St.Rep. 49, this Court held that a city was without power to make a valid contract which would de-prive it in future years from imposing such license tax as the law then justified, un-less there was legislative authority to do so. We agree that the only question we have to decide in that connection is wheth-er there was legislative or constitutional authority granted to the city, effective Sep-tember 23, 1941, to make a contract of that sort.

We do not think that the constitutional provisions have application. Section 220 of the Constitution is a limitation on legis-lative power so as to give cities the right to veto the use of its streets for business purposes. City of Montgomery v. Orpheum Taxi Co., 203 Ala. 103, 82 So. 117; Bush v. City of Jasper, 247 Ala. 359, 24 So.2d 543.

Section 221, Constitution, is for the pur-pose of protecting the city from legislative enactments which would deprive it of the benefit of levying license fees when the State has laid such a tax for itself.

Section 228, Constitution, is a limitation on the duration of franchises granted by cities of a certain population.

■ We think there is nothing in those three provisions of the Constitution which look to the authority of a city to contract away its power to raise revenue by im-posing license charges within the limita-tions fixed by statute.

Section 745, Title 37, Code, was in effect when the contract of September 23, 1941, was made. That statute fixed a maximum of two percent of the gross receipts in the municipality for the preceding year, which

a city may fix as a license charge. The last sentence in that statute is as follows: "Provided that this shall not affect any existing contract, between any municipality and any public utility operating therein." This proviso first made its appearance and was in that form in the Act of September 14, 1915.—General Acts 1915, page 520, section 92. It was carried into the Act of September 15, 1919, General Acts 1919, page 428, section 89, in the same language. It became section 2162 of the Code of 1923, and section 24-a of the Act of July 22, 1927, General Acts 1927, page 166, and sec-tion 745, Title 37 of the Code of 1940. In all those statutes it purports to leave un-affected existing contracts between a city and a utility. In none of them does it look to the future. There is no law that we know of that does look to the future. It is doubtful as to its meaning even as to existing contracts.

■ It looks like the power to license within the maximum must not be contrary to contracts existing when the license is laid. This probably means valid contracts. Such provision must be construed also in the light of section 735, Title 37, Code, then in effect, that a license cannot run longer than one year.

The Code went into effect May 31, 1941, before the contract of September 23, 1941, which contract was therefore then non-existent. Therefore, that feature of sec-tion 745, supra, could not have the effect of ratifying that contract, whatever it might mean. But since said contract was made, the legislature has readopted sec-tion 745 twice. General Acts 1947, page 240; General Acts 1949, page 945.

■ In both of those acts instead of the proviso appearing as set out in section 745, Title 37, Code, it was set up in the following language: "Provided that this shall not affect any existing contract, be-tween any municipality and any public utility operating therein, except those pro-vision of contracts which relate to the amount or basis of the license tax imposed by municipalities on such utilities." The legislature was therefore desirous of mak-ing it clear that it was not intended by

section 745, supra, to validate any contract made by a city with a utility which would have the effect of limiting the right of the city to levy a license tax as thereby authorized. Those acts also increase the maximum amount which the cities may impose on utiltiies from two percent to three percent of the gross receipts of business done by the utility in the municipality during the preceding year. They seem to be the only ones enacted by the legislature since the contract of September 23, 1941 was made touching the subject and they clearly and distinctly provide in substance that, notwithstanding any such contract, the city has the right to levy a license tax within the maximum there provided.

■ It is contrary to the spirit of the governmental function of a city for it to make a contract which will limit its legal authority to raise revenue in future years, regardless of what its needs may be.

■ The license tax, as we have stated, only extends for a year. Municipalities may change the amount of it from year to year within the limits fixed by law then applicable. Such status is made manifest by the Acts of 1947 and 1949, supra.

■ We do not think that section 563, Title 62, Code, which is a local law applicable alone to the City of Montgomery, has a different effect. Under that law it is necessary for the City of Montgomery to provide for adequate compensation or consideration for the granting of franchises by the city. Such consideration may be in the nature of a specified amount or a sum measured by a percentage of the gross receipts of the utility. The percentage of the gross receipts is without limit fixed by law. But it is determined solely as the result of negotiation and contract between the city and utility and has no relation whatsoever to the right and power of the city conferred by section 745, Title 37, supra, as amended, to levy a license tax within the maximum limits there expressed. And under the provisions of section 733, Title 37, Code, the city likewise has the power to levy a license tax on business done in the police jurisdiction, but not exceeding one-half of the amount charged and collected for business done within the city, provided, of course, that such fees shall not exceed what may be reasonably necessary for police purposes. The amount of the compensation for the franchise as provided in section 563, supra, is over and above and has no connection with or relation to the license tax authorized by sections 745 and 733, supra.

■ We know of no law or constitutional provision which would give the authority to the City of Montgomery or any other municipality in Alabama to bind itself by contract as to the amount of the license tax in future years, which it may impose by authority of legislation then existing.

It is our opinion therefore that the decree of the Circuit Court, in Equity, of Montgomery is contrary to our views here expressed in declaring that the license tax proposed by the City of Montgomery by ordinance dated December 13, 1944, is null and void and of no effect, and that the ordinance of the City of Montgomery dated September 23, 1941 is the license ordinance under which appellee is authorized to operate and that the same shall remain in full force and effect throughout the term of the franchise and, further, that the appellee recover of the City of Montgomery any sums of money paid in excess of the license required by said ordinance dated September 23, 1941, and said decree of said court in the respects just stated is hereby reversed and is here rendered so as to adjudge and decree that the ordinance of the City of Montgomery of December 13, 1944 is not null and void sofar as any question here presented is concerned, to the extent that it provides for a license tax of two percent of the gross receipts of appellee derived from business within the city and therefore, to that extent, it supersedes the ordinance of the city dated September 23, 1941, and appellee is not entitled to recover from the City of Montgomery any sums paid in accordance with the ordinance of December 13, 1944, except that which is in excess of two percent of the gross receipts derived by appellee from its business conducted within the municipality.

Rehearing granted: judgment of affirmance set aside: judgment of the circuit court reversed and one here rendered.

BROWN, LAWSON, SIMPSON and STAKELY, JJ., concur.

LIVINGSTON, J., dissents.